

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 04-60904-CIV-SEITZ/MCALILEY

DIANE JUDSON and NIGEL C.
SIMPSON, on behalf of themselves
and others similarly situated,

    Plaintiffs,

v.

JM FAMILY ENTERPRISES, INC., a
Delaware corporation, and SOUTHEAST
TOYOTA DISTRIBUTORS, LLC, a
Florida Corporation,

    Defendants.
_____/



## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment **[DE 46]**. Plaintiffs Diane Judson and Nigel Simpson (collectively "Plaintiffs") seek recovery of unpaid overtime compensation from Defendants under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"). In response, Defendants contend that they are entitled to summary judgment because Plaintiffs are exempt administrative employees under the FLSA. Upon review of the motion, the response, and the reply thereto, as well as all relevant portions of the record, the Court grants Defendants' Motion for Summary Judgment because there are no genuine issues of material fact for trial.

**I.    Background**

    <u>A.</u>    <u>The Parties</u>

Plaintiffs commenced this action on July 12, 2004, by filing a Complaint alleging that Defendants violated the FLSA's overtime wage provisions. Defendant Southeast Toyota Distributors, LLC ("SET") is the exclusive distributor of Toyota automobiles in Florida, Georgia, Alabama, North Carolina, and South Carolina. (Parks Aff. ¶ 2.) In this role, SET regularly intercedes in disputes between Toyota consumers, dealers, and manufacturers in instances of customer dissatisfaction with regard to alleged vehicle defects.

SET thus employs Customer Loyalty Specialists whose purpose is to resolve customer claims in a manner that maintains customer loyalty to the Toyota brand. (Parks Aff. ¶ 3; Judson Dep. 22:25-23:5.) Defendant JM Family Distributors, Inc. ("JM") is the sole shareholder of SET; it provides fringe benefits to SET's employees and sets policies that govern Plaintiffs' employment.[1] (Sylvester Dep. 6, 8, 10; Simoneaux Dep. at 6, 111.)

### B. Customer Loyalty Specialists

Defendants employed Plaintiffs Judson and Simpson as Customer Loyalty Specialists from November 2000 through July 2004 and from March 2000 through December 2003, respectively. (Judson Dep. 5:21-6:2; Simpson Dep. 5:8-24.) Defendants paid Plaintiffs on a salary basis every two weeks. (Sylvester Aff. ¶¶ 2-6) Accordingly, Plaintiffs earned the equivalent of eighty hours each pay period, regardless of the quality of work performed and the number of hours actually worked.[2] (*Id.*)

Although Customer Loyalty Specialists are not required to have either a college degree or specialized training (Simoneaux Dep. 15, 8), the position does require the following qualifications: (1) strong verbal, written, and interpersonal communication skills with adeptness in dealing with individuals at all levels inside and outside the organizations; (2) ability to manage workflow and handle priorities with minimal supervision; (3) conflict resolution and negotiation skills; (4) organizational and follow-up skills; and (5) decision-making skills (Judson Dep., Ex. 2). Thus, Defendants' job posting described the position as follows:

> Responsible for case management of all customer contacts within assigned districts. Position requires this individual to investigate and resolve all retail customer concerns. Responsible for making goodwill decisions. Individual will interact heavily with SET field travelers and dealers with regard to customer concerns, the survey system, incentives, Arbitration and Lemon Law contracts with the focus on Customer retention. This person will be responsible for handling all Customer Loyalty activities within the assigned districts.

---

[1] Although Defendants denied during discovery that JM employs Plaintiffs, they did not raise such issue in their Motion for Summary Judgment. (Pls.' Response at 1, n.1.) Accordingly, for purposes of this Order, the Court will assume that SET and JM collectively employ Plaintiffs.

[2] Specifically, Judson received $1,916.92 per pay period and Simpson received $1,890.42 per pay period. (Sylvester Aff. ¶¶ 5-6.)

(*Id.*) Thus, after a customer contacts Toyota national headquarters with a complaint and Toyota sets up an electronic case file, the Customer Loyalty Specialists are responsible for reviewing the files and for taking all necessary action. (Judson Dep. 13:16-14:10; Simpson Dep. 18:20-20:25.) Indeed, Plaintiffs handled notice of defect cases, lemon law demands, product liability cases, arbitration requests, customer correspondence cases, and walk-in cases. (Parks Dep. 59; Simoneaux Dep. 72.)

    1. *Plaintiff Judson's Job Duties*

In resolving customer concerns, Plaintiff Judson would typically review the case file and conduct any necessary leg work before contacting the customer. (Judson Dep. 14:12-14.) For example, if the case file noted that a vehicle had been at a dealership for an extended period of time, Judson might initially contact either the dealership or the appropriate SET District Manager. (*Id.* 15:5-11) Judson would also contact the dealership's Service Director or Service Manager to determine the customer's vehicle history and verify the customer's concerns. (*Id.* 16:24-17:10.) Once she performed this initial work, Judson would then make initial contact with the customer and conduct her own interview to verify the information provided by Toyota headquarters. (*Id.* 16:15-20.) Following this contact, Judson would also perform the following tasks as needed: (1) ensure that the dealership's Service Manager became involved in attempting to repair the vehicle; (2) involve the District Manager where the customer's concern could not be resolved between herself and the dealership personnel; (3) contact the customer to keep them informed; and (4) educate the customer regarding vehicle design. (*See id.* 17:26-20:20.)

In certain situations, where the customer was discouraged with Toyota, Judson would offer a customer goodwill in an effort to maintain loyalty. According to Judson, Defendants did not want its customers "to get discouraged with Toyota and go to Honda. So we would really bend over backwards to try to keep them with Toyota and do the right thing." (*Id.* 23:1-5.) For instance, Judson could offer car payment reimbursements, service agreements that would protect the vehicle upon expiration of the manufacturer's warranty, loyalty coupons, vehicle-towing reimbursements, airline ticket reimbursements,

repair reimbursements, and rental car reimbursements. Judson determined the appropriate form of goodwill for a particular situation on a case-by-case basis, which often required negotiating with customers. (*See id.* 21:12-23:12; 24:5-12; 29:13-30:18.) For example, if a vehicle's tires wore out prematurely, Judson might offer to pay for two new tires for the vehicle. (*Id.* 30:1-5.) Likewise, if an out-of-state customer's vehicle broke down in Florida, Judson could arrange reimbursement for airline tickets and transportation of the vehicle back to the customer's home state. (*Id.* 29:13-24.) Finally, Judson also performed repair order analyses, negotiated with customers, and represented Defendants at approximately ten arbitration hearings and two Lemon Law hearings.[3] (*Id.* 40:19-41:15; 48:7-10, 16-17.)

### 2. *Plaintiff Simpson's Job Duties*

Plaintiff Simpson testified that his job duties mirrored Judson's with a few additions. (Simpson Dep. 23:11-15.) Thus, once Simpson received a case, he would contact the customer first, and then the dealership, to hear both sides of the story. (*Id.* 25:1-19.) According to Simpson, he determined during the course of each telephone call whether the customer simply wanted to vent his frustration or whether he needed to get involved. (*Id.* 26:18-25.) Thereafter, he would perform the following duties as needed: (1) contact the servicing dealership to gather information; (2) call the Service Director, Customer Relations Manager, and/or Technician; (3) analyze such information to determine what would resolve the customer's concern; (4) ask a technical representative to supervise repairs and suggest alternatives when necessary; and (5) gather all information regarding the vehicle's repair history. (*See id.* 25-27, 30, 41.) In addition, as with Judson, Simpson could offer a customer various forms of goodwill, including free vehicle service, movie tickets, dinner coupons, reimbursing costs, car payment reimbursements, and cash compensation. (*Id.* 12:16-33; 13:17-14:3; 32:19-33:2; 39:8-12.) In so doing, he would negotiate with the customer to ensure that

---

[3] According to Judson, Customer Loyalty Specialists use negotiation skills whenever they have to tell a customer no. "[Y]ou want to tell them why you are telling them no, or if you are trying to get the customer to agree to additional repair attempts, even though they feel we've had our chances and they are not giving them more. So, you know, asking them to let us repair their vehicle one more time." (*Id.* 54: 12-21.) In addition, Judson testified that Customer Loyalty Specialists "have to play devil's advocate, tell him [the customer] what his options are and at the same time do the right thing by the customer, but also try not to buy back too many vehicles." (*Id.* 40:10-18.)

Defendants did not offer an excessive amount of goodwill, while ensuring that the customer was satisfied. (*Id.* 47:16-20.) With respect to offering goodwill, Simpson testified that he offered new ideas to the department, including his technique of asking the customer if certain compensation would "make them happy" before committing SET and asking certain questions to dealership technicians to determine whether they were properly inspecting and repairing the vehicle. (*Id.* 44:10-25.)

In addition to these duties, Simpson also represented SET at arbitration hearings and prepared and gathered appropriate information for Lemon Law proceedings. (*Id.* 35:21-37:7; 48:13-50:18.) Furthermore, because Simpson was assigned to the SET District encompassing South Florida, he was also responsible for resolving issues when a customer came in person to SET's office. (*Id.* 21:17-23:4.) Finally, Simpson was responsible for overseeing the Customer Manager Relations Club - which involved organizing, designing, and conducting training each quarter for the automotive dealers in his District. (*Id.* 21:17-23:4.)

C.   Supervision of Customer Loyalty Specialists

As Customer Loyalty Specialists, Plaintiffs reported to Customer Loyalty Supervisor Amy Parks, who in turn reported to Customer Loyalty Managers Dave Adams and Steve Simoneaux. (Parks Aff. ¶ 6) Parks testified that she engaged in "very close" supervision of the Plaintiffs. (Parks Dep. 25:8-10.) Her supervision consisted of keeping track of whether they arrived on time, and counseling and disciplining them if they came late because Defendants expected all Customer Loyalty Specialists to be at work by 8:00 a.m. (*Id.* 27:5-8.) Similarly, Defendants required the Customer Loyalty Specialists to fill out a time sheet if they were going to be away from the office for more than four hours and to inform Parks if they were taking more than one hour for lunch. (*Id.* 68:1-5; 68:22-69:7.)

In addition to monitoring the schedules of her employees, Parks also sent out e-mails to employees when they had work that was due or overdue. (*Id.* 48:15-19.) According to Parks:

> [I]f it's something that's due that day, it's just like a reminder email to them. If it's something that can't be completed or if its something overdue, that they're expected to get back with myself as to why it's not complete or why it's overdue, or to complete it that day, yes."

Page 5 of 15

(*Id.* 48:25-49:6.) Thus, Parks only required employees to respond to the e-mails if they could not meet the deadlines. (*Id.* 49:7-11.) Similarly, Plaintiffs could not vary from any deadlines established by Customer Loyalty Manager Simoneaux. (*See* Simoneaux Dep. 96:2-14.)

### D. Defendants' Training & Policies

Defendants did not provide extensive training to their Customer Loyalty Specialists. For instance, Judson received three hours of training regarding her position from a co-worker and attended two days of negotiation skills training. (Judson Dep. 32:206, 54:21-25.) Likewise, Simpson received a half day of training regarding his position from a co-worker and attended a class on managing conflict resolution. (Simpson Dep. 11:21-12:1; 42:1-7.) In addition, approximately once per month, Defendants required Plaintiffs to attend lunch meetings, which included training and discussions about their cases. (Parks Dep. 31:3-32:2.) At these "lunch and learns," Defendants would provide guidance to the Customer Loyalty Specialists as to how to resolve certain situations. (*See* Simoneaux Dep. 51:3-16.)

Finally, although there were no written guidelines with respect to the Customer Loyalty Specialist position when Plaintiffs first started their positions, in the Summer of 2003, SET developed a procedures manual to assist new hires and provide guidance to current Customer Loyalty Specialists. (*See* Parks Aff. ¶ 8; Judson Dep. 25:20-25.) Judson described the procedures manual as follows:

> [It was] made up by one of our summer interns, and when he was finished with it . . . the manual was routed to each of us to review. But, you know, we didn't really have time to review it. I mean, it was pretty much a manual that put in writing what we already had been doing, what we already knew to do, policy and procedures for handling any variety of situations."

(Judson Dep. 26:5-13.) Thus, according to Judson, she did not depend on the procedures manual to perform her job because "by the time the manual came out, we knew our jobs and we knew what the guidelines were by having learned as we went." (*Id.* 26:14-18.) Similarly, Simpson testified that, despite his request, "our department did not have [a] set[,] or I should say a policy and procedure manual" and instead, SET would send out occasional memos regarding procedures. (Simpson Dep. 29:15-24.) Simpson did testify, however,

that a procedures manual might have been created, but that Customer Loyalty Specialists were never given a copy of such manual. (*Id.* 29:15-19.)

### E. Guidelines as to Goodwill

With respect to offering Goodwill, it appears that Defendants required Customer Loyalty Specialists to operate within a range of reasonableness and to follow the procedures manual. (*See* Simoneaux Dep. at 48, 54) As stated by Judson, "if we are dealing with a customer who owned one of our high end vehicles . . . we were allowed to give up to, say, $750 to [$]1000 in good will money, or something equal to that dollar equivalent," whereas "on lesser price vehicles, we were told okay, give $250 or, you know, maybe $350, but . . . it was very clear to us what we could spend and what we couldn't." (Judson Dep. 25.) Consequently, Plaintiffs were instructed that it was "probably not a good idea" to offer a car payment and an extended warranty to the same person or to offer an extended warranty to a customer who already had one, as it would "not make good business." (Simoneaux Dep. at 80:10-22; 81:7-12; 84:4-8)

The parties dispute whether Plaintiffs got pre-approval for their goodwill decisions. According to both Plaintiffs, Customer Loyalty Specialists would typically get the approval of a manager before making a goodwill gesture. (*See* Judson Dep. 23; Simpson Dep. 33.) Defendants aver, however, that "Customer Loyalty Specialists had pretty much free reign to put in there what they feel would be an appropriate use of Toyota's time and/or money. Certainly, that's not to say that they could offer, you know, a hundred thousand dollars, but the goal here is to try to resolve the consumer's issues." (Simoneaux Dep. 48:8-21.) Indeed, "[t]here's not a, quote, table that says, 'If the consumer has this model vehicle, this many miles, this age, you're only able to offer up to X dollars.' We don't have those type of parameters in there. So it comes down to good business judgment . . . ." (*Id.* 49:18-25.; Parks Dep. 24:14-17; 37:15-38:2.; 40:13-22.) Thus, it is not clear whether Plaintiffs simply made recommendations to Defendants as to goodwill gestures or if they could make offers without pre-approval. In either event, however, it is undisputed that Defendants rarely, if ever, disagreed with Plaintiffs' goodwill gestures. (Judson Dep. 23:17-24; 24:13-25:1; Simpson

Dep. 32:24-33:7.) Moreover, neither party disputes that once a Customer Loyalty Specialist made an offer to a customer, the offer generally stood. (*See id.*; Parks Dep. 39:6-10.)

## II.     Standard of Review

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56). Accepting this evidence as truthful, the Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52). In determining whether to grant summary judgment, the district court must remember that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

This case involves the applicability of the FLSA's administrative exemption to Plaintiffs' employment. "The determination of whether a given employee falls within the scope of an FLSA exemption, while based on the underlying facts, is ultimately a legal question." *Viart v. Bull Motors, Inc.*, 149 F. Supp. 2d 1346, 1349 (S.D. Fla. 2001). The administrative exemption is to be "narrowly construed against the employers seeking to assert [it]." *Arnold v. Ben Kanowsky Inc.*, 361 U.S. 388, 392 (1960). Moreover, application of the exemption is limited to those circumstances plainly and unmistakably within the exemptions's terms and spirit. *Id.* at 392. Finally, under the FLSA, the employer has the burden of establishing the applicability of an exemption by a preponderance of the evidence. *Dybach v. State of Fla.*

*Dept. of Corrections*, 942 F.2d 1562, 1566 n.5 (11th Cir. 1991).

### III.   The Administrative Exemption

The FLSA prohibits an employer from subjecting an employee to a workweek consisting of more than forty hours without receiving compensation at a rate not less than one and one-half times the regular rate at which he is employed. 29 U.S.C. § 207(a)(1). However, the FLSA also provides a myriad of exceptions and exemptions from the general overtime requirement. *See Kuchinskas v. Broward County*, 840 F. Supp. 1548, 1556 (S.D. Fla. 1993), *aff'd*, 86 F.3d 1168 (11th Cir. 1996). As such, one of the FLSA's exemptions provides: "[t]he provisions of Sections 206 . . . and 207 of this title shall not apply with respect to any employee employed in a bona fide . . . administrative . . . capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary . . . ." 29 U.S.C. § 213(a)(1). *See also Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1272 (S.D. Fla. 2004). Here, because Plaintiffs are exempt administrative employees, Defendants are entitled to summary judgment as a matter of law.

The Department of Labor ("DOL") has established both a "short" and "long" duties test to determine whether someone is an exempt administrative employee. *See* 29 C.F.R. 541.2. Where, as here, an employee earns a minimum salary of $250.00 per week, the short test is applicable, and such employee will meet the administrative exemption if the following three part test is met: (1) they are paid on a salary basis; (2) their primary duty is the performance of office or non-manual work "directly related to management policies or general business operations of the employer or the employer's customers"; and (3) the performance of such primary duty requires "the exercise of discretion and independent judgment." 29 C.F.R. 541.214(a). *See also Reyes v. Hollywood Woodwork, Inc.*, 360 F. Supp. 2d 1288, 1291 (S.D. Fla. 2005) (outlining elements of administrative exemption).[4] The Court will address each of these criteria in turn.

---

[4] Because the long test only applies where an employee is paid less than $250 per week, but more than $150 per week, it does not govern the instant action. *See* 29 C.F.R. § 541(e)(1).

Page 9 of 15

A.   Defendants Paid Plaintiffs On A Salary Basis

The undisputed record evidence in this case establishes that Defendants paid both Plaintiffs on a salary basis. Under the FLSA, an employee is considered to be paid on a salary basis if he or she regularly receives each pay period a predetermined amount constituting all or part of the total compensation owed. 29 C.F.R. § 541.118. Here, Defendants paid Plaintiffs the equivalent of eighty hours every two weeks, regardless of the quality of work performed and the number of hours actually worked.

Plaintiffs argue that they were not salaried employees because Defendants required them "to submit a time report and use personal or vacation time to be paid" when they were going to be away from the office. This argument, however, is not supported by the record. Rather, while the record indicates that Plaintiffs could use personal or vacation time when they were away from work, neither Mr. Parks nor Ms. Mangini testified that Defendants required Plaintiffs to use their personal or vacation time for such absences. (Parks. Dep. 68:1-5; Mangini Dep. 9:22-11:18) Accordingly, Defendants have met the first prong of the short test.[5]

B.   Plaintiffs' Job Duties Are Directly Related To Defendants' General Business Operations

Turning to the second factor of the short test, the Court finds that Plaintiffs' primary duty is the performance of office or non-manual work directly related to Defendants' general business operations. The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative operations of a business, as opposed to production. 29 C.F.R. § 541.205(a). Administrative operations include, *inter alia*, advising the management, negotiating, and representing the company. 29 C.F.R. § 541.205(b). Thus, the regulations limit the administrative exemption to those employees who perform work of substantial importance to the management or to the operation of the business. 29 C.F.R. § 541.205(a). People

---

[5] In addition, the Court notes that the DOL permits partial pay deductions. "Where an employer has a benefits plan (e.g., vacation time, sick leave), it is permissible to substitute or reduce the accrued leave in the plan for the time an employee is absent from work, whether the absence is a partial day or a full day, without affecting the salary basis of payment, if the employee nevertheless receives in payment his or her guaranteed salary." *See* DOL Op. Letter, 2005 WL 330606 (Jan. 7, 2005).

performing work of substantial importance "include those . . . who either carry out major assignments in conducting the operations of the business or whose work affects business operations to a substantial degree . . . ." 29 C.F.R. § 541.205(c).

In the instant case, it is undisputed that Plaintiffs did not perform production work for Defendants. Rather, Plaintiffs' acted as an adjustor between consumers, dealers, and manufacturers to assure customer satisfaction and to maintain loyalty to the Toyota brand. (*See, e.g.* Parks Aff. ¶ 3.) Indeed, Defendants testified that they regularly intercede in disputes between Toyota, consumers, dealers, and manufactures in instances of customer dissatisfaction with regard to alleged vehicle defects, and that they hired Customer Loyalty Specialists to resolve such claims. (*See, e.g.* Parks Aff. ¶ 3.) Thus, given that Defendants are in the business of selling and distributing Toyotas and providing financing and warranty products related to those vehicles (*See* Pls.' Resp. at 12.), Plaintiffs' duties of ensuring good customer relations and maintaining customer loyalty clearly have a direct relationship to Defendants' business operations and are substantially important to them. Furthermore, Plaintiffs advised Defendants, acted as their representative, and negotiated with customers, actions which are specifically described as administrative in the regulations. *See Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir. 1997) Accordingly, viewing the record in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs performed work of substantial importance to the operation of Defendants' business.[6]

---

[6] Although Plaintiffs argue that their duties did not involve creating or implementing Defendants' policies (*See* Pls.' Resp. at 11), Plaintiffs failed to cite to the record in support of such argument. In addition, while Plaintiffs correctly point out that Defendants are not specifically in the business of resolving customer complaints, the Court nevertheless finds that Plaintiffs' duties were of substantial importance, given that Defendants hired them specifically to assure customer loyalty to the Toyota brand. (Parks. Aff. ¶ 3). Finally, although Plaintiffs state that only a minor portion of their job included the offering of goodwill, Plaintiffs have not disputed that they also represented Defendants to customers and negotiated with customers. Thus, while the regulations suggest that an employee's primary duty must constitute over fifty percent of his or her time, *See* 29 C.F.R. § 541.103, Plaintiffs have neither provided any analysis as to this point nor disputed the evidence that Plaintiffs' performed other functions that were of substantial importance to Defendants. *See Haywood*, 121 F.3d at 1072.

### C. Plaintiffs Exercised Discretion And Judgment As A Normal Function Of Their Job Positions

Finally, Defendants have met the third prong of the short term test, as Plaintiffs engaged in work that requires the exercise of discretion and independent judgment. 29 C.F.R. § 541.2(e). The DOL regulations provide that "discretion and independent judgment" generally means "the comparison and evaluation of possible courses of conduct and action or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). In addition, discretion and independent judgment must be exercised "customarily and regularly," meaning "a frequency which must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.207(g). These terms imply "that the person has the authority or power to make an independent choice, free from immediate discretion or supervision and with respect to matters of significance." *Reyes v. Hollywood Woodworks, Inc.*, 360 F. Supp. 2d 1288, 1292 (S.D. Fla. 2005).

The DOL regulations specify that the ability to make final decisions is not necessary to possess sufficient discretion and independent judgment to qualify as an exempt administrative employee. 29 C.F.R. § 541.207(e). In this regard:

> [Discretion and independent judgment] does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of reviews. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendation for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised and reversed after review does not mean that the employee's not exercising discretion and independent judgment . . ."

29 C.F.R. § 541.207(d). *See also Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir. 2004) (affirming district court's holding that Allstate insurance agents are exempt employees, despite the fact the fact that Allstate "'closely regulated what products the test plaintiffs sold, how they sold those products, and the manner in which they provided customer service.'"). Nevertheless, courts must distinguish the exercise of discretion and independent judgment from simply using skills. 29 C.F.R. § 541.207(c)(1). For instance, "[a]n employee who merely applies his knowledge in following prescribed procedures or determining which procedures to

follow . . . is not exercising discretion and independent judgment, . . . even if there is some leeway in reaching a conclusion." *Id.* Thus, one who develops a skill based on specific guidance, and then simply applies those skills based on memory, does not exercise discretion and independent judgment. *See Sack v. Miami Helicopter Serv., Inc.*, 986 F. Supp. 1456, 1470 (S.D. Fla. 1997) (noting that the purchasing of parts for repair work and the visual and physical inspection of aircraft are tasks requiring the application of skill and thus do not require discretion).

In the instant case, the record evidence viewed in the light most favorable to Plaintiffs demonstrates that Plaintiffs exercised discretion and independent judgment in carrying out their duties.[7] Indeed, on a daily basis, Plaintiffs gathered information about a particular customer and his or her vehicle, interviewed the customer and asked questions, analyzed whether the customer simply wanted to vent or if further action was needed, determined the best method of having the customer's complaint resolved, and negotiated with the customer when necessary.[8] Furthermore, Plaintiffs would also determine whether to offer goodwill, and in such cases, they would make recommendations to Defendants as to the appropriate goodwill gesture. In these circumstances, Plaintiffs own testimony demonstrates that at the very least, they were a variety of goodwill expenditures they could offer depending on the circumstances.

Plaintiffs argue that they did not exercise discretion and independent judgment because Defendants closely supervised them and because they did not have any responsibility for hiring, firing, or supervising other employees. Plaintiff's first contention – that they did not exercise discretion and independent judgment because Defendants required them to work regular hours, meet deadlines, and submit time reports – is without

---

[7] Indeed, the Customer Loyalty Specialist position requires the following qualifications: (1) strong verbal, written, and interpersonal communications skills with adeptness in dealing with individuals at all levels inside and outside the organizations; (2) ability to manage workflow and handle priorities with minimal supervision; (3) conflict resolution and negotiation skills; (4) organizational and follow-up skills; and (5) decision-making skills. Moreover, the Customer Loyalty Specialist job position specifically provides that Plaintiffs had responsibility for resolving all customer concerns and for making goodwill decisions.

[8] In addition, Simpson also had responsibility for overseeing the Customer Manager Relations Club - which involved organizing, designing, and conducting training each quarter for the automotive dealers in his District. These activities further required him to use his discretion and independent judgment.

merit. Not only did Plaintiffs fail to cite to a single case in support of this argument, but the DOL regulations specifically provide that the term discretion and independent judgment does not imply that an employee's decisions are not reviewed.[9] 29 C.F.R. 541.207(e). In addition, although it is true that Plaintiffs did not hire, fire, or supervise any employees, such tasks are not specifically required to meet the administrative exemption. *See, e.g. Reyes v. Hollywood Woodwork, Inc.*, 360 F. Supp. 2d 1288, 1292-93 (S.D. Fla. 2005) (finding that employee who prepared bids for employer's architectural woodwork projects was exempt, despite the fact that there was no evidence that employee hired, fired, or supervised others). Thus, these arguments add little to this Court's analysis.

Plaintiffs' stronger argument in opposition to the motion for summary judgment is that the bulk of their work was routine, in that they simply followed set guidelines outlined in the procedures manual in resolving customer complaints. However, after reviewing all of the record evidence, the Court concludes that Plaintiffs did more than merely follow procedures; rather, Plaintiffs utilized their judgment in determining whether it was necessary to get involved in a particular case and the best course of action for resolving the customer's concerns. Furthermore, in handling each case, Plaintiffs had to decide whether to offer any goodwill, and if so, what type of goodwill to recommend to Defendants. Thus, although the procedures manual offered guidance to Plaintiffs, the undisputed testimony of both Plaintiffs and Defendants demonstrates that Plaintiffs were given latitude in negotiating with customers, determining the best course of action, and recommending goodwill.[10] Thus, as in *McAllister v. Transamerica Occidental Life Ins. Co.*,

---

[9] Indeed, while Plaintiffs suggest that they did not have discretion as to when to complete their tasks, the record evidence does not corroborate such claim. Although Plaintiffs did have deadlines for completing their work, nothing in the record suggests that Defendants required them to work on specific projects on specific days or that they could not complete a task before the deadline.

[10] The Court has reviewed the sections of the procedures manual submitted as evidence in this case and finds that although it provides guidance to Customer Loyalty Specialists, it did not constrain Plaintiffs actions such that they did not have to exercise independent judgment. For instance, the manual states, "There are times when it may seem necessary to offer the customer something to ensure that they stay a loyal Toyota owner. The Customer Loyalty Department has many options under the Reimbursement of non-repair goodwill expense. If you are not sure whether you can make an offer to a customer, contact the Customer Assistance Center Reimbursement Team . . ." Furthermore, the manual goes on to describe specific situations that may arise. For example, "Upon removing a bed-

325 F.3d 997 (8th Cir. 2003), because the procedures manual gave Plaintiffs discretion, the Court finds that they exercised discretion and independent judgment in exercising their job duties. *Id.* at 1001 (stating, "[j]ust because McAllister was required to follow detailed manuals does not mean that she did not exercise discretion and independent judgment."). *See also Haywood*, 121 F.3d at 1068, 1072 (holding that an employee who investigates customer claims and negotiates a resolution with the customer exercises discretion and independent judgment). Accordingly, the Court concludes that there are no genuine issues of material fact as to the third prong of the analysis and that Defendants are entitled to summary judgment.

## IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that Defendants' Motion for Summary Judgment **[DE 46]** is GRANTED.

All pending motions not otherwise ruled upon are DENIED AS MOOT. This case is CLOSED.

DONE AND ORDERED in Chambers at Miami, Florida, this 17th day of October, 2005.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:   Counsel of Record

---

liner on a Tacoma, a new owner expresses dissatisfaction with paint chipping that has occurred and requests a spray-on liner. In general, to reimburse for the original bed-liner, paint repair and pay for a new bed-liner (particularly after-market) would be considered excessive." *See* Pls.' Response, Ex. 15.